**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
MELANIE PERSINGER (275423)
*mel@westonfirm.com*
PAUL K. JOSEPH (287057)
*paul@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:   (619) 798-2006
Facsimile:    (480) 247-4553

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACQUELYN MCGEE, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DIAMOND FOODS, INC.<br><br>Defendant. | Case No: 3:14-cv-02446-JAH-DHB<br>Pleading Type: Class Action<br><br>**OPPOSITION TO MOTION TO DISMISS**<br><br>Date: December 22, 2014<br>Judge: The Honorable John A. Houston<br>Time: 2:30 p.m.<br>Location: Courtroom 13B |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ II

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD ............................................................................................. 3

ARGUMENT ......................................................................................................... 3

I.     PLAINTIFF HAS STANDING TO BRING THIS ACTION ................................... 3

      A.    Plaintiff's increased risk of disease from consuming trans fat is a credible risk of harm ........................................................................... 4

      B.    Defendant's unfair business practices increase Ms. McGee's risk of contracting disease. ......................................................................... 6

      C.    Ms. McGee suffered an economic injury when she paid for a safe product, but receive a product that was detrimental to her health ................. 8

II.    MCGEE ADEQUATELY ALLEGES UNFAIR BUSINESS PRACTICES .......... 11

      A.    Unfair Business Practice Claims Rarely Are Amenable to Resolution on the Pleadings ........................................................................... 11

      B.    The Complaint Satisfies All Three Possible Tests for Unfair Practices ....... 11

          Substantial Injury Test ................................................................. 11

          Public Policy Test ........................................................................ 14

          FTC Test ..................................................................................... 15

III.   DIAMOND'S PRACTICE OF ADDING TRANS FAT TO POPCORN IS A PUBLIC NUISANCE .................................................................................. 16

      A.    McGee Alleges Harm Different in Kind Than Harm to the Public .............. 17

      B.    Diamond's Use of PHVO Is Not Expressly Authorized ............................. 18

IV.   MCGEE ALLEGES BREACH OF IMPLIED WARRANTY ............................. 19

V.    PRIMARY JURISDICTION DISMISSAL IS INAPPROPRIATE ...................... 22

      A.    No Complex Scientific Issue or Question of First Impression Exists .......... 23

      B.    Dismissal Would Unfairly Prejudice Ms. McGee by Tolling the Statute of Limitations ................................................................... 24

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................3

*Baur v. Veneman*,
    352 F.3d 625 (2d Cir. 2003) .......................................................4, 5, 6, 7

*Beck v. Prupis*,
    529 U.S. 494 (2000)................................................................................14

*Birke v. Oakwood Worldwide*,
    169 Cal. App. 4th 1 540 (2009) ............................................................17

*Bishop v. 7-Eleven, Inc.*,
    2014 U.S. Dist. LEXIS 56010 (N.D. Cal. Apr. 21, 2014)......................8

*Boris v. Wal-Mart Stores, Inc.*,
    2014 U.S. Dist. LEXIS 56115 (C.D. Cal. Apr. 9, 2014) ......................15

*Brazil v. Dole Food Co.*,
    935 F. Supp. 2d 947 (N.D. Cal. 2013)..............................................23, 24

*Brittalia Ventures v. Stuke Nursery Co., Inc.*,
    153 Cal. App. 4th 17 (2007) ................................................................21

*Brown v. MCI Worldcom Network Servs., Inc.*,
    277 F.3d 1166 (9th Cir. 2002) .............................................................24

*Bruton v. Gerber Prods. Co.*,
    961 F. Supp. 2d 1062 (N.D. Cal. 2013) ...............................................11

*Cent. Delta Water Agency v. United States*,
    306 F.3d 938 (9th Cir. 2002) ..................................................................7

*Chavez v. Blue Sky Natural Bev. Co.*,
    268 F.R.D. 365 (N.D. Cal. 2010) .........................................................24

*Chavez v. Blue Sky Natural Bev. Co.*,
    340 Fed. Appx. 359 (9th Cir. 2009) .......................................................9

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013)............................................................................7

*Clark v. Time Warner Cable*,
    523 F.3d 1110 (9th Cir. 2008) .............................................................22

*Cnty. of Santa Clara v. Atlantic Richfield Co.*,
    137 Cal. App. 4th 292  (2006) .............................................................16

*Connecticut v. Am. Elec. Power Co.*,
    582 F.3d 309 (2d Cir. 2009) ..................................................................4

*Covington v. Jefferson County*,
    358 F.3d 626 (9th Cir. 2004) ........................................................4, 5, 7

*Davel Commc'ns. v. Qwest Corp.*,
    460 F.3d 1075 (9th Cir. 2006) ........................................................23, 24

*Delacruz v. Cytosport, Inc.*,
    2012 U.S. Dist. LEXIS 51094 (N.D. Cal. Apr. 11, 2012)................23, 24

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ..................................................................8

*Doe v. United States*,
    419 F.3d 1058 (9th Cir. 2005) ..............................................................3

*Experian Info. Solutions, Inc. v. Lifelock, Inc.*,
    633 F. Supp. 2d 1104 (C.D. Cal. 2009)...............................................15

*Greater Westchester Homeowners Ass'n v. L.A.*,
    26 Cal. 3d 86 (1979) .....................................................................18, 19

*Hall v. Norton*,
    266 F.3d 969 (9th Cir. 2001) ............................................................4, 5

*Hoyte v. Yum! Brands, Inc.*,
    489 F. Supp. 2d 24 (D.D.C. 2007)...................................................19, 20

*Ileto v. Glock Inc.*,
    349 F.3d 1191 (9th Cir. 2003) ............................................................17

iii

*In re Adobe Sys. Privacy Litig.*,
    2014 U.S. Dist. LEXIS 124126 (N.D. Cal. Sept. 4, 2014) ...................................... 14

*In re First Alliance Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) ................................................................ 11

*In re Morning Song Bird Food Litig.*,
    2013 U.S. Dist. LEXIS 149153 (S.D. Cal. Sept. 30, 2013) ...................................... 9

*In re Toyota Motor Corp.*,
    754 F. Supp. 2d 1145 (C.D. Cal. 2010) ................................................... 23

*Ivie v. Kraft Foods Global, Inc.*,
    2013 U.S. Dist. LEXIS 25615 (N.D. Ca. Feb. 25, 2013) ...................................... 9

*Jones v. ConAgra Foods, Inc.*,
    2012 U.S. Dist. LEXIS 178352 (N.D. Cal. Dec. 17, 2012) ................................... 24

*Kane v. Chobani, Inc.*,
    2013 U.S. Dist. LEXIS 99359 (N.D. Cal. July 15, 2013) ...................................... 18

*Kraft Reinsurance Ir., Ltd. v. Pallets Acquisitions, LLC*,
    845 F. Supp. 2d 1342 (N.D. Ga. 2011) ................................................... 21

*Krottner v. Starbucks Corp.*,
    628 F.3d 1139 (9th Cir. 2010) ...........................................................4, 5

*Kwikset Corp. v. Superior Court*,
    51 Cal. 4th 310 (2011) ...........................................................3, 8, 9, 10

*Lind v. City of San Luis Obispo*,
    109 Cal. 340 (1895) .................................................................... 17

*Lockwood v. Conagra Foods, Inc.*,
    597 F. Supp. 2d 1028 (N.D. Cal. 2009) ................................................23, 24

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ...................................................................... 5

*Lozano v. AT&T Wireless Servs.*,
    504 F.3d 718 (9th Cir. 2007) .............................................................. 11

iv

*Mangini v. Aerojet-General Corp.*,
   230 Cal. App. 3d 1125 (1991) ................................................................................. 17

*McConnell v. Pacificorp, Inc.*,
   2007 U.S. Dist. LEXIS 63948 (N.D. Cal. Aug. 16, 2007) ...................................... 23

*McDonald v. Coldwell Banker*,
   543 F.3d 498 (9th Cir. 2008) ................................................................................... 11

*McKell v. Wash. Mutual, Inc.*,
   142 Cal. App. 4th 1457 (2006) ................................................................................ 11

*Mohamed v. Jeppesen Dataplan, Inc.*,
   579 F.3d 943 (9th Cir. 2009) ..................................................................................... 3

*Motors, Inc. v. Times Mirror Co.*,
   102 Cal. App. 3d 735 (1980) .................................................................................... 12

*NRDC v. United States EPA*,
   735 F.3d 873 (9th Cir. 2013) .................................................................................. 4, 6

*Olivera v. Am. Home Mortg. Servicing, Inc.*,
   689 F. Supp. 2d 1218 (N.D. Cal. 2010) ................................................................... 10

*People ex rel. Busch v. Projection Room Theater*,
   17 Cal. 3d 42 (1976) ................................................................................................ 16

*People ex rel. Gallo v. Acuna*,
   14 Cal. 4th 1090 (1997) ........................................................................................... 16

*Pisciotta v. Old Nat'l Bancorp*,
   499 F.3d 629 (7th Cir. 2007) ..................................................................................... 4

*Reiter v. Cooper*,
   507 U.S. 258 (1993).................................................................................................. 24

*Rubio v. Capital One Bank*,
   613 F.3d 1195 (9th Cir. 2010) ........................................................................ 8, 11, 14

*Samet v. Procter & Gamble Co.*,
   2013 U.S. Dist. LEXIS 86432 (N.D. Cal. June 18, 2013)......................................... 9

v

*Sanderson Farms, Inc. v. Tyson Foods, Inc.*,
  549 F. Supp. 2d 708 (D. Md. 2008) ................................................................ 24

*Sevidal v. Target Corp.*,
  189 Cal. App. 4th 905 (2010) ......................................................................... 10

*Simpson v. Cal. Pizza Kitchen, Inc.*,
  13-cv-00164-JLS (JMA) ........................................................................... 7, 22

*Simpson v. Cal. Pizza Kitchen, Inc.*,
  989 F. Supp. 2d 1015 (S.D. Cal. 2013) .................................................. 6, 10, 22

*Skeen v. BMW of N. Am., LLC*,
  2014 U.S. Dist. LEXIS 9256 (D.N.J. 2014) ..................................................... 20

*Stauber v. Shalala*,
  895 F. Supp. 1178 (W.D. Wis. 1995) ............................................................... 8

*Sutton v. St. Jude Med. S.C., Inc.*,
  419 F.3d 568 (6th Cir. 2005) ............................................................................ 8

*TCG New York Inc. v. City of White Plains*,
  305 F.3d 67 (2d Cir. 2002) .............................................................................. 23

*United States v. Andrews*,
  600 F.3d 1167 (9th Cir. 2010) ........................................................................ 14

*United States v. Gen. Dynamics Corp.*,
  828 F.2d 1356 (9th Cir. 1987) ........................................................................ 22

*United States v. Lembke Constr. Co.*,
  786 F.2d 1386 (9th Cir. 1986) ........................................................................ 20

*United States v. Students Challenging Regulatory Agency Procedures*,
  412 U.S. 669 (1973) ......................................................................................... 8

*Varjabedian v. Madera*,
  20 Cal. 3d 285 (1977) ..................................................................................... 19

*Viggiano v. Hansen Natural Corp.*,
  944 F. Supp. 2d 877 (C.D. Cal. 2013) ............................................................. 20

vi

*Von Koenig v. Snapple Bev. Corp.*,
    713 F. Supp. 2d 1066 (E.D. Cal. 2010) ..................................................... 10

*Williamson v. McAfee, Inc.*,
    2014 U.S. Dist. LEXIS 117565 (N.D. Cal. Aug. 22, 2014) ..................................... 11

*Wright v. General Mills, Inc.*,
    2009 U.S. Dist. LEXIS 90576 (S.D. Cal. Sept. 30, 2009) ..................................... 24

**STATUTES**

Cal. Civ. Code § 1791.1 ........................................................................... 24

Cal. Civ. Code § 3479 ............................................................................. 21

Cal. Civ. Code § 3482 ............................................................................. 23

Cal. Com. Code § 2314(2)(c) ...................................................................... 24

Cal. Com. Code § 2316 ............................................................................ 25

Cal. Ed. Code § 49431.7 .......................................................................... 18

Cal. Health & Safety Code § 104100 .............................................................. 18

Cal. Health & Safety Code § 114377 .............................................................. 18

**OTHER AUTHORITIES**

75 Fed. Reg. 76526 (Dec. 8, 2010) ........................................................... 2, 5, 12

78 Fed. Reg. 67169 (Nov. 8, 2013) ............................................................ 2, 22

Baer *et al.*, *Dietary fatty acids affect plasma markers of inflammation in healthy*
    *men fed controlled diets; a randomized crossover study,* 79 Am. J. Clin.
    Nutr. 969-73 (2004) ............................................................................ 2

Dariush Mozaffarian *et al.*, *Trans Fatty Acids and Cardiovascular Disease*,
354 N. Engl. J. Med. 1601-13 (2006). ........................................... 1, 5, 21

Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary
Guidelines Advisory Committee Report, Section 10 (2005) .................................... 1

Lopez-Garcia *et al.*, *Consumption of Trans Fat is Related to Plasma Markers of
Inflammation and Endothelial Dysfunction,* 135 J. of Nutr. 562-66 (2005) ............. 2

*Peterson v. Mazda Motor of Am., Inc.*, 2014 U.S. Dist. LEXIS 127421 (C.D.
Cal. Sept. 9, 2014) ................................................ 13

**REGULATIONS**

21 C.F.R. § 101.9 ........................................................ 22

21 C.F.R. § 181 ........................................................ 3

21 C.F.R. § 182 ........................................................ 3

21 C.F.R. § 184 ........................................................ 3

21 C.F.R. § 186 ........................................................ 3

## INTRODUCTION

The adverse health effects of consuming trans fats are devastating. They are "far stronger on average than those of food contaminants or pesticide residues." (Compl. ¶ 19.) More than any other substance, trans fats raise the risk of coronary heart disease, the leading cause of death in North America. (*Id.* ¶ 27.) In fact, "more than 30,000 deaths per year may be due to the consumption of partially hydrogenated vegetable [oil]" ("PHVO")—which Diamond Foods, Inc. ("Diamond") puts into its Trans Fat Popcorns. (*Id.* ¶ 28.)

All artificial trans fat consumption damages the body, because it is incorporated into organ cells in place of chemically distinct natural fat, deforming and disabling them. This organ cell dysfunction, in turn, causes a large number of diseases, including cardiovascular disease, diabetes, cancer, Alzheimer's, cognitive decline, and chronic systemic inflammation. (*See generally* Compl. ¶¶14-54). "On a per calorie basis, trans fats . . . increase the risk of [Coronary Heart Disease] more than any other [product]."[1] Just a two percent increase in energy intake from trans fatty acids is associated with a "23 percent increase in the incidence of CHD."(*Id.*)

As the federal government has found, the "relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease." (Compl. ¶ 31).[2] This "direct and progressive" relationship between trans fat consumption and heart disease means *all trans fat consumption* is harmful, and every package of popcorn Diamond adds trans fat to increases the risk of heart disease to those who consume it compared with almost all of its competitors. "To date, there have been no reports issued by authoritative sources that provide a level of trans fat in the diet . . .

---

[1] Dariush Mozaffarian *et al.*, *Trans Fatty Acids and Cardiovascular Disease*, 354 N. Engl. J. Med. 1601-13 at 1608-1609 (2006).

[2] citing Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005)

1

below which there is no risk of [Coronary Heart Disease]." (*Compl.* ¶ 34, quoting 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010)).

Diamond's behavior is the classic example of an unfair business practice prohibited by the Unfair Competition Law. It uses a food additive that is unquestionably extremely dangerous in any amount, when, as amply documented in the Complaint, *none of its major competitors do*. Because "any incremental increase in trans fat consumption increases the risk of CHD," Plaintiff suffered physical injury each time she consumed Defendant's Trans Fat Popcorn. 78 Fed. Reg. 67169, 67172 (Nov. 8, 2013).

Indeed, beyond increasing the risk of heart disease, all trans fat consumption harms the body because it is incorporated "into endothelial cell membranes," which "alter[s] cellular and macromolecular components acting at the interface of the blood vessel cell wall. This could result in changes in the anithemostatic properties, altered vascular tone, hyperadhesiveness to blood leukocytes, and increased cytokine growth factor production, all of which are characteristics of endothelial dysfunction."[3]

Most food manufacturers have responded responsibly to these dangers by removing trans fats from their products—but Diamond has not. (*Id.* ¶¶ 12, 59.) Instead, Diamond promotes and sells them to people, like Ms. McGee, who are unaware of the dangers of trans fats and too busy or unqualified to scrutinize every label and research every ingredient of every food product they buy. Diamond's intentional acts are an unfair business practice, a public nuisance, and a breach of the implied warranty of merchantability, which specifically harmed those who, like Ms. McGee, bought or consumed the products.

Diamond is also wrong, as a matter of fact, that the FDA granted trans fat "Generally Recognized As Safe" status, (Mot. at 2 n.1). First, trans fat nowhere appears

---

[3] Lopez-Garcia *et al.*, *Consumption of Trans Fat is Related to Plasma Markers of Inflammation and Endothelial Dysfunction,* 135 J. of Nutr. 562-66 (2005); *see also* Baer *et al.*, *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets; a randomized crossover study,* 79 Am. J. Clin. Nutr. 969-73 (2004)

2

on the FDA's list of the hundreds of substances it considers GRAS. *See* 21 C.F.R. §§ 181, 182, 184, 186. Second, trans fat fails to meet the fundamental requirement for GRAS status—that the substance is safe. Although Diamond claims that the FDA considers trans fat safe, the FDA has explicitly recognized that there is no safe level of artificial trans fat consumption. (Compl. ¶ 34.) Further, even if trans fats were GRAS, Diamond would need to make the difficult showing that Congress intended, when it passed the Food Additives Amendment that created the GRAS food additive classification, to broadly preempt state food-safety regulations. Diamond does not even attempt to make such a showing.

## LEGAL STANDARD

Courts should not dismiss a claim where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. On a motion to dismiss, courts should "construe the complaint in the light most favorable to the plaintiffs, taking all their allegations as true and drawing all reasonable inferences from the complaint in their favor." *Mohamed v. Jeppesen Dataplan, Inc.*, 579 F.3d 943, 949 (9th Cir. 2009) (alterations omitted) (quoting *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005)).

## ARGUMENT

## I. PLAINTIFF HAS STANDING TO BRING THIS ACTION

"[F]ederal courts have reiterated that injury in fact is not a substantial or insurmountable hurdle; as then Judge Alito put it: Injury-in-fact is not Mount Everest. Rather, it suffices for federal standing purposes to allege some specific, identifiable trifle of injury." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 324 (2011) (internal citations, alterations and quotations omitted). "[T]he injury-in-fact requirement can be

3

satisfied by a threat of future harm." *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010) (quoting *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007)). Thus, "[i]f a plaintiff faces a credible threat of harm, and that harm is both real and immediate, not conjectural or hypothetical, the plaintiff has met the injury-in-fact requirement for standing under Article III." *Id.* (internal citations, quotations, and alterations omitted). Further, the Ninth Circuit has "consistently held that an injury is 'actual or imminent' where there is a 'credible threat' that a probabilistic harm will materialize." *NRDC v. United States EPA*, 735 F.3d 873, 878 (9th Cir. 2013) (collecting cases).

### A. Plaintiff's increased risk of disease from consuming trans fat is a credible risk of harm.

"[E]vidence of a credible threat to the plaintiff's physical well-being" is sufficient to satisfy the injury requirement. *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001). As the Ninth Circuit has repeatedly held, a demonstrable increase in the risk of illness is sufficient. *See Covington v. Jefferson County*, 358 F.3d 626, 654 (9th Cir. 2004) (plaintiff's exposure and fear of exposure to "skin cancer, cataracts, and/or a depressed immune system" from ozone depletion was an injury-in-fact). Thus, where harm may result from exposure, the exposure itself constitutes an injury. *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 343-44 (2d Cir. 2009) ("the relevant 'injury' for standing purposes may be *exposure* to a sufficiently serious risk of medical harm—not the anticipated medical harm itself" (quoting *Baur v. Veneman*, 352 F.3d 625, 641 (2d Cir. 2003)).

Here, Plaintiff's Complaint alleges, with ample support from reliable, peer reviewed medical journals and government studies, that trans fat consumption causes, among other maladies, cardiovascular disease, diabetes, and multiple forms of cancer. *See* Compl. ¶¶ 14-54. Plaintiff further alleges that "[t]here is 'no safe level' of artificial

trans fat intake." (Compl. ¶ 14). As the Complaint details, the FDA itself has noted consuming "any" trans fat is dangerous:

> the [Institute of Medicine] does **not** set a UL for trans fatty acid because **any** incremental increase in trans fatty acid intake increases the risk of CHD."

(*Id.* ¶ 16 (quoting 75 Fed. Reg. at 76542). *See also id.* ¶ 17 ("complete or near-complete avoidance of industrially produced trans fat . . . may be necessary to avoid adverse effects" (quoting 354 N. Engl. J. Med. at 1608-09.)); *id.* ¶ 19 ("The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues, which have in some cases received considerable attention." (quoting Mozaffarian et al.)).) The harm caused by consuming even small amounts of trans fat is so serious that the FDA is poised to ban artificial trans fat in all food, because previous attempts to reduce consumption through labeling requirements have been insufficient. *See* Tentative Determination re Partially Hydrogenated Oils, 78 Fed. Reg. 67169-67175.

Thus, Plaintiff has properly alleged, based on credible, peer reviewed medical journals and government studies that consuming artificial trans fat—at any level—is harmful. *Covington*, 358 F.3d at 652-53 (where "Congress recognized th[e] precise injury" and "requir[ed] the EPA to promulgate regulations," the alleged harm was credible); *Baur*, 352 F.3d at 637-640 (allegations of injury based on governmental studies were credible enough to establish standing).

Further, the "harm is both real and immediate, not conjectural or hypothetical," *Krottner*, 628 F.3d at 1143 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)), because as Plaintiff alleges *she has already consumed and been exposed to trans fat from Defendant's products. Hall*, 266 F.3d at 976 ("[E]vidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing."). Specifically, Ms. McGee alleges that she "suffered physical injury when she repeatedly consumed Defendant's

Trans Fat Popcorns, because consuming artificial trans fat in any quantity causes inflammation and damage to vital organs and an increased risk of heart disease, diabetes, cancer, and death." (*See* Compl. ¶ 67.) These allegations of *actual exposure and actual* "inflammation and damage to vital organs," (*id.*), are more than sufficient because the injury in fact requirement is satisfied by mere *risk of exposure*. *See NRDC*, 735 F.3d at 879 (Plaintiff showed "a 'credible threat' that its members' children *will be exposed* to AGS-20"; *Baur*, 352 F.3d at 640 (plaintiff has standing and "faces a *present, immediate* risk of exposure to [mad cow disease]" where he was "a consumer of beef products" and Defendant's practices increased the risk of contaminated beef being placed into the national food supply.).

**B. Defendant's unfair business practices increase Ms. McGee's risk of contracting disease.**

Defendant's argument, based almost entirely on *Simpson*, is wrong both factually and legally. First, in contrast to *Simpson* where the Court held the plaintiff failed to "allege facts that establish that the consumption of trans fats in the amount present in the Contested Pizzas are sufficient to cause any harmful effects," *(*Mot. 6)[4], Ms. McGee alleges that "consuming artificial trans fat in any quantity causes inflammation and damage to vital organs and an increased risk of heart disease, diabetes, cancer, and death," (*see* Compl. ¶ 67). Moreover, the Trans Fat Popcorns contains as much as 9 times more artificial trans fat per serving than the product in *Simpson* and Ms. McGee consumed the Trans Fat Popcorns for three times longer than the plaintiff in *Simpson*. *Compare* Compl. ¶ 56, *with Simpson*, 989 F. Supp. 2d. at 1022 (Plaintiff "consum[ed the challenged pizza] five times over the period of a year"), *and Simpson v. Cal. Pizza*

---

[4] Although Diamond misrepresents this as a quote from *Simpson*, the Court's language was actually much narrower and stated only that the plaintiff did "not allege facts tending to show that such isolated instances of TFA consumption are sufficient to cause the enumerated harmful effects." *Simpson v. Cal. Pizza Kitchen, Inc.*, 989 F. Supp. 2d 1015, 1022 (S.D. Cal. 2013).

*Kitchen, Inc.*, 13-cv-00164-JLS (JMA), Docs. 20-5 through 20-29 (labels showing nutrition facts of each challenged pizza). Thus, unlike in *Simpson*, Ms. McGee alleges facts establishing that the artificial trans fat she consumed from the Trans Fat Popcorns is sufficient to cause harm.

Second, contrary to Defendant's assertion that Plaintiff must show "a substantial probability of harm," (Mot. at 5) in the Ninth Circuit "even a small probability of injury is sufficient to create a case or controversy – to take a suit out of the category of the hypothetical," *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 949 (9th Cir. 2002). *See Covington*, 358 F.3d at 652 (standing satisfied based on "exposure and fear of exposure to" even "a marginal increase in the risk of serious maladies").[5] Because "the probability of harm necessary for injury in fact varies with the severity of the probable harm," a risk of "*grave harms minimizes the required probability of their occurrence for injury in fact purposes.*" *Covington*, 358 F.3d at 652 (emphasis added). Here, the "severity of the probable harm" could not be more "grave": trans fat consumption causes heart disease, cancer, and diabetes, the first, second, and sixth leading causes of death in the U.S. Further, the possibility that Ms. McGee will not contract heart disease, cancer, or diabetes does not undermine her standing, because plaintiffs are not required "to demonstrate that it is literally certain that the harms they identify will come about," *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 n.5 (2013). Thus, the increased risk of these diseases from consuming Defendant's high-trans popcorn easily satisfies this

---

[5] Although Defendant may contend that risk of exposure only constitutes an injury in environmental cases, this argument has been carefully considered and rejected:

> Although this type of injury has been most commonly recognized in environmental cases, the reasons for treating enhanced risk as sufficient injury-in-fact in the environmental context extend by analogy to consumer food and drug safety suits. Like threatened environmental harm, the potential harm from exposure to dangerous food products or drugs "is by nature probabilistic," yet an unreasonable exposure to risk may itself cause cognizable injury.

*Baur*, 352 F.3d at 634.

standard. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264-65 (2d Cir. 2006) ("exposure to toxic or harmful substances has been held sufficient to satisfy the Article III injury-in-fact requirement even without physical symptoms of injury caused by the exposure"); *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 574-75 (6th Cir. 2005) (holding that Article III standing was satisfied where a defective medical implement presented an increased risk of future health problems).

In short, Plaintiff has "a direct stake in the controversy and prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 687 (1973). She has alleged that consuming *any* amount of trans fat creates a credible risk of harm and that she has already consumed the trans fat. Thus "th[e] increased *risk of potential harm* that the [plaintiff] must bear is an injury in fact for standing purposes." *Stauber v. Shalala*, 895 F. Supp. 1178, 1187-88 (W.D. Wis. 1995) ("[Defendants'] suggestion that [plaintiffs] lack standing because the injury they allege is speculative confuses the anticipated . . . consequences of the [agency action] with the . . . injury [plaintiffs] actually claim").

### C. Ms. McGee suffered an economic injury when she paid for a safe product, but receive a product that was detrimental to her health

Not only has Ms. McGee suffered a cognizable physical injury, she has also suffered an economic injury sufficient to satisfy both Article III and UCL standing.[6] "There are innumerable ways in which economic injury from unfair competition may be shown." *Kwikset Corp.*, 51 Cal. 4th at 323. For example, "[a] plaintiff may (1) surrender

---

[6] A plaintiff that has UCL standing necessarily has Article III standing since UCL standing is narrower in that it "requires a particular kind of injury in fact—loss of 'money or property.'" *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 n.3 (9th Cir. 2010). *See also Bishop v. 7-Eleven, Inc.*, 2014 U.S. Dist. LEXIS 56010, at *11 (N.D. Cal. Apr. 21, 2014) (the UCL "incorporate[s] the Article III standing requirements" with the added "require[ment] that the plaintiff plead an economic injury").

in a transaction more, or acquire in a transaction less, than he or she otherwise would have,", because the product was unsatisfactory. *Id.*

Here, Ms. McGee suffered an economic injury when she "bought the Trans Fat Popcorns seeking popcorn that was safe for her and her family to consume, not one containing an artificial laboratory-produced fat that causes heart disease and cancer." (Compl. ¶ 70.) In other words, Ms. McGee did not receive the benefit she thought she was obtaining—a healthy product—but rather received a dangerous product. Plaintiff further alleges, she "is not a nutritionist, food expert, or food scientist, but rather a lay consumer who does not have the specialized knowledge that Defendant had, which otherwise would have enabled her to associate . . . artificial trans fat with disease." (Compl. ¶ 69.) *See also id.* ("Even today the nature and extensive utilization of artificial trans fats . . . is largely unknown to the average consumer."). Thus, Plaintiff alleges benefit of the bargain injury. *See Ivie v. Kraft Foods Global, Inc.*, 2013 U.S. Dist. LEXIS 25615, at *12 (N.D. Ca. Feb. 25, 2013) ("The alleged purchase of a product that plaintiff would not otherwise have purchased but for the alleged unlawful label is sufficient to establish an economic injury-in-fact . . . ."); *Chavez v. Blue Sky Natural Bev. Co.*, 340 Fed. Appx. 359, 360-61 (9th Cir. 2009) ("benefit of the bargain" is a viable basis for standing); *Samet v. Procter & Gamble Co*, 2013 U.S. Dist. LEXIS 86432, at *10 (N.D. Cal. June 18, 2013) ("health-conscious consumers" properly alleged economic injury where they would not have purchased the products had they know the truth about its ingredients).

Contrary to Defendant's assertion, Plaintiff did not receive the benefit of the bargain merely because she consumed the popcorn. Ms. McGee was "seeking popcorn that was safe," (Compl. ¶ 70), but instead received a product that was "detrimental to her health," (*id.* ¶ 71). *See In re Morning Song Bird Food Litig.*, 2013 U.S. Dist. LEXIS 149153, 10-11 (S.D. Cal. Sept. 30, 2013) ("Plaintiffs allege they suffered an economic injury because they spent money to purchase the bird food which was worthless because

it was not fit for consumption by birds. The Court finds Plaintiffs sufficiently allege an injury in fact"); *Von Koenig v. Snapple Bev. Corp.*, 713 F. Supp. 2d 1066, 1078-1079 (E.D. Cal. 2010) (plaintiffs have standing where they "allege that they were seeking a product without [High Fructose Corn Syrup] and thus, defendant's drink product was unsatisfactory"). Further, Defendant's reliance on *Simpson* is misplaced because the Court presumed that because "the fact that the Contested Pizzas contained TFAs was explicitly divulged," the Plaintiff was aware of the harm caused by consuming artificial trans fat. *Simpson*, 989 F. Supp. 2d at 1022-23. Here in contrast, Ms. McGee expressly alleges that as a normal lay consumer she lacked the "specialized knowledge that Defendant had, which otherwise would have enabled her to associate . . . artificial trans fat with disease." (Compl. ¶ 69.)

Defendant also contends that Plaintiff can only establish economic injury if she purchased the "product in reliance on false or misleading information," Mot. at 5. But this argument incorrectly applies the reliance requirement needed for claims under the UCL's fraudulent prong, but not required for claims such as Ms. McGee's under the *unfair* prong. *See Olivera v. Am. Home Mortg. Servicing, Inc.*, 689 F. Supp. 2d 1218, 1224 (N.D. Cal. 2010) ("For claims based on the 'unfair' or 'unlawful' prong of the UCL . . . courts have held that the plaintiff need not allege reliance on misrepresentations, and may allege 'causation more generally.'"). In reality, the standing requirement under the UCL "focuses on the defendant's conduct and is substantially less stringent than a reliance or 'but for' causation test," *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 924 (2010). Indeed, the causation requirement "should be read in light of its apparent purposes, i.e., to <u>eliminate standing for those who have not engaged in any business dealings with would-be defendants . . . while preserving for actual victims of deception and other acts of unfair competition</u> the ability to sue and enjoin such practices." *Kwikset Corp.*, 51 Cal. 4th at 317. Ms. McGee is not someone who did "not engaged in any business dealings with would-be defendants." Rather she bought Defendant's Trans Fat

Popcorns for years and but for Defendant's unfair business practices "Plaintiff would not have been able to purchase the Trans Fat Popcorns." (Compl. ¶ 71.)

Accordingly, Plaintiff has suffered an economic injury caused by defendant's unfair business practices.

## II.  MCGEE ADEQUATELY ALLEGES UNFAIR BUSINESS PRACTICES

### A. Unfair Business Practice Claims Rarely Are Amenable to Resolution on the Pleadings

"Whether a practice is 'deceptive, fraudulent, or unfair' is generally a question of fact that is not appropriate for resolution on the pleadings." *Bruton v. Gerber Prods. Co.*, 961 F. Supp. 2d 1062, 1089 (N.D. Cal. 2013). *Accord*, *McKell v. Wash. Mutual, Inc.*, 142 Cal. App. 4th 1457, 1473 (2006).

### B. The Complaint Satisfies All Three Possible Tests for Unfair Practices

The UCL's "intentionally broad" and "sweeping" coverage prohibits any "unlawful, unfair or fraudulent business act." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006). "A practice may be deemed unfair even if not specifically proscribed by some other law. The statute prohibits wrongful business conduct in whatever context such activity might occur." *Id.* (citation omitted).

"California courts have held that such an unfair business practice for purposes of this prong is 'one that either offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" *Williamson v. McAfee, Inc.*, 2014 U.S. Dist. LEXIS 117565, at *17-18 (N.D. Cal. Aug. 22, 2014) (quoting *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008)). "The Ninth Circuit . . . approves the use of either test." *Id.* at *18.

<u>**Substantial Injury Test**</u>

A business practice is substantially injurious to consumers when the harm to the consumer outweighs the utility to the defendant. *Rubio*, 613 F.3d at 1205 (citing *Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 735 (9th Cir. 2007)). This test is referred to as the

11

"balancing test." *See id.* While

> weigh[ing] the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . . is complicated enough after a hearing in which the defendant has revealed the factors determining the utility of his conduct, it is really quite impossible if only the plaintiff has been heard from, as is the case when it is sought to decide the issue of unfairness on demurrer. Therefore—since the complaint is unlikely to reveal defendant's justification—if that pleading states a prima facie case of harm, having its genesis in an apparently unfair business practice, the defendant should be made to present its side of the story.

*Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980).

Here, the Complaint does just that, providing detailed allegations of the serious harm Diamond's use of artificial trans fat causes to consumers' health, with extensive citation to scholarly medical journals supporting each of these allegations. (Compl. ¶¶ 14-54.) Specifically, McGee alleges that consuming trans fat seriously injures health by calcifying the arteries and internal organs and increasing the risk of CHD, diabetes, cancer, and Alzheimer's disease. (*Id.* ¶¶ 14-54.)

Contrary to Diamond's assertion that Plaintiff does not allege "any specific ill effects at all," McGee alleges she "suffered physical injury when she repeatedly consumed Defendant's Trans Fat Popcorns, because consuming artificial trans fat in any quantity causes inflammation and damage to vital organs and an increased risk of heart disease, diabetes, cancer, and death." (*Id.* ¶ 67.) In the face of FDA efforts to ban the use of artificial trans fat in large part because of the "positive linear trend between trans fatty acid intake and LDL cholesterol concentration, and therefore . . . the risk of CHD," 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010), Diamond cannot seriously contend that Plaintiff's alleged injury is "not . . . plausible," (Mot. at 10).

Diamond "has not made an argument about the utility of its conduct." *Peterson v.*

*Mazda Motor of Am., Inc.*, 2014 U.S. Dist. LEXIS 127421, at *7 (C.D. Cal. Sept. 9, 2014) Instead, Diamond argues only that any injury suffered is "certainly not one that outweighs Diamond's practice of including a lawful ingredient in its products." (Mot. at 10). But this begs the question of whether its conduct is actually lawful: just because the FDA has not finalized its regulation prohibiting trans fat, that does not mean that laws of general application cannot prohibit its use in products where doing so causes an unjustified harm to consumers. Moreover, the proper comparator is the *utility* of Diamond's use of trans fat, which it does not even address, and for good reason. Diamond itself notes that it offers "84 different available varieties of microwaveable popcorn products that do not contain trans fats." (Mot. at 9 (citing Compl. Ex. B).) Diamond's willingness to forego the use of trans fat in so many comparable products shows that any potential utility is negligible.

Although Diamond provides no evidence of utility, the only possible countervailing utility to Diamond is to slightly decrease production costs and slightly higher profits. (Compl. ¶¶ 12, 58-66.) Plaintiff alleges that the serious harm to consumer health far outweighs the utility of any marginal decrease in production cost to Diamond. (*Id*. ¶ 62.) McGee supports this allegation with studies examining the costs and benefits of trans-fat bans—which find significant benefits to consumer health, with no significant impact on food taste, quality, price, or availability, (*id*. ¶¶ 23-26). In addition, the cost of switching to one of the safer and widely available PHVO alternatives is minimal. (*Id*. ¶¶ 23-24.) Because Plaintiff has alleged significant harm to consumers of the Trans Fat Popcorns, and Diamond has not argued its use has any utility—nor could it—McGee has stated a claim under the UCL unfair prong. *See Peterson*, 2014 U.S. Dist. LEXIS 127421, at *17 (plaintiff stated UCL unfair claim where she alleged a "defect created a safety risk for drivers and passengers" and defendant "ha[d] not made an argument about the utility of its conduct").

## Public Policy Test

McGee also satisfies the public policy test, by alleging Diamond's business practices violate public policy as declared by "specific constitutional, statutory or regulatory provisions." *See Rubio*, 613 F.3d at 1205. The California Health and Safety Code states "[i]t is unlawful for any person to manufacture . . . or offer for sale any food," § 110620, that "contains any poisonous or deleterious substance that may render it injurious to health of man . . ." § 110545. Trans fat is "injurious" to human health, and Defendant's continued use directly violates this statute. The Legislature has already made such findings, banning the sale of foods containing artificial trans fats in schools and restaurants, *see* Health & Safety Code § 114377; Ed. Code § 49431.7, because "[t]here is an overwhelming amount of evidence revealing the damage trans fat can do to the health of an individual." S.B. 490, 2007 Reg. Sess. (Cal. 2007) (enacted). Thus, these statutes embody a public policy of protecting public health and reducing the amount of trans fat in the public's diet because of the health dangers it poses. Diamond's sale of the Trans Fat Popcorns, as alleged, violates such public policy. (Compl. ¶¶ 3, 64-65.) *See also* Health & Safety Code § 104100 (declaring cardiovascular disease a serious health hazard and public policy to reduce it).

Diamond's argument that its conduct must meet every element of the statutes underlying these policies would collapse the "unfair" prong of the UCL into the "unlawful" prong, thus ignoring the "longstanding canon of statutory construction that terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous." *United States v. Andrews*, 600 F.3d 1167, 1173 (9th Cir. 2010) (quoting *Beck v. Prupis*, 529 U.S. 494, 506 (2000)). A proper construction of the UCL makes clear that "[t]he 'unfair' prong does not require Plaintiffs to plead direct violations of these statutes." *In re Adobe Sys. Privacy Litig.*, 2014 U.S. Dist. LEXIS 124126, at *76 (N.D. Cal. Sept. 4, 2014) (rejecting argument that "Plaintiffs' 'public policy' allegations are flawed because Plaintiffs do not plead violations of the OPPA, the

14

IPA, and the CRA"). Instead, Plaintiff must allege that defendant's conduct violates *the public policy embodied in the statutes*. *See id.* (UCL unfair claim stated where "Plaintiffs plausibly allege[d] that the OPPA, the IPA, and the CRA reflect California's policy objective of reasonably securing customer data. . . . [and] Plaintiffs further plausibly allege[d] that Adobe's purported failure to provide industry-standard security undermines that policy objective"). *See also Boris v. Wal-Mart Stores, Inc.*, 2014 U.S. Dist. LEXIS 56115, at *18 (C.D. Cal. Apr. 9, 2014) (the "specific constitutional, statutory, or regulatory provision" need only "embod[y] a policy that [defendant's practice] violate").

Another example is *Experian Info. Solutions, Inc. v. Lifelock, Inc.*, 633 F. Supp. 2d 1104, 1108 (C.D. Cal. 2009). There, plaintiff Experian, a credit reporting agency, asserted a UCL unfair violation under the public policy test and tethered the violation to Section 1681c-1 of the FCRA, which obliged plaintiff to place fraud alerts upon the direct request of individual consumers. *Experian Info. Solutions, Inc.*, 633 F. Supp. 2d at 1108. The alleged unfair activity was that defendant Lifelock, a company offering identity theft protection services, was submitting fraud alert requests to Experian. *Id.* Although the statute required only that Experian process requests from individuals, the court found that "the statute embodie[d] a public policy of limiting the obligations of consumer reporting agencies" and "that the public policy [wa]s violated when companies like Lifelock place[d] fraud alerts inconsistent with those limitations." *Id.* Similarly, here, plaintiff tethers her UCL unfair claim to statutes which embody a public policy of protecting public health and limiting consumption of trans fat because of the health dangers it posts. Diamond violates that public policy by selling the Trans Fat Popcorns to the public, despite the availability of safer alternative oils.

### FTC Test

Diamond also asserts that Plaintiff cannot maintain a UCL unfair claim under a third, alternative UCL unfair "FTC test" "because she cannot allege an injury that she could not have reasonably avoided." (Mot. at 8.) Diamond argues plaintiff could have

avoided her injury because the Nutrition Facts panel on the Trans Fat Popcorns discloses the trans fat content. However, Plaintiff is "a lay consumer who does not have the specialized knowledge . . . which otherwise would have enabled her to associate partially hydrogenated oil with artificial trans fat, and artificial trans fat with disease." (Compl. ¶ 69.) Moreover, "reasonable avoidance" should not be construed as "could have purchased another product," as this would allow companies to get away with selling *anything,* as long as it is not at gunpoint.

And although Diamond does not contest the other elements of the FTC test—a substantial injury not outweighed by countervailing benefits to consumers or competition—they are similarly met here. As described above, in discussing the balancing test, the injury to consumers here is substantial, including "inflammation and damage to vital organs and an increased risk of heart disease, diabetes, cancer, and death," (Compl. ¶ 67). This harm is also not outweighed by any countervailing benefits to consumers or competitors as the only possible benefit is a cost saving to Diamond, which is potentially injurious to competition.

## III. DIAMOND'S PRACTICE OF ADDING TRANS FAT TO POPCORN IS A PUBLIC NUISANCE

Public nuisances are not limited to activities "which are offensive to the five senses." *See People ex rel. Busch v. Projection Room Theater*, 17 Cal. 3d 42, 50-51 (1976). "Anything which is injurious to health . . . so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance." Cal. Civ. Code § 3479. "A public nuisance is one which affects at the same time . . . any considerable number of persons." Cal. Civ. Code § 3480. Any interference that is substantial and unreasonable may be enjoined. *People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1105 (1997). "It is substantial if it causes significant harm and unreasonable if its social utility is outweighed by the gravity of the harm inflicted." *Cnty. of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292, 305 (2006).

Trans fat is a dangerous ingredient that is harmful when consumed in any amount. (Compl. ¶ 90.) Diamond manufactures, promotes, and sells popcorn with dangerous amounts of trans fat—creating a dangerous condition that interferes with the public's right to a safe and uncontaminated food supply. (*Id.* ¶¶ 89-90.) Diamond's promotion and sale of products containing toxic trans fat substantially and unreasonably interferes with the public's interests in  a safe food supply and cause the public an unreasonable inconvenience. (*Id.* ¶ 91.)

### A. McGee Alleges Harm Different in Kind Than Harm to the Public

Contrary to Diamond's contention, McGee alleges a special injury. The alleged general harm to the public is Diamond's interference with its "right to a safe food supply," and "interest in having only safe foods available for purchase." (*Id.* ¶¶ 89, 91.) In contrast, Plaintiff alleges suffering both "physical and emotional harm," and "lost money." (*Id.* at ¶¶ 71, 93.) Physical and emotional injuries, as well as loss of money, have repeatedly been held to constitute harm different in kind than the interference with the public's general interest in safety. *See Ileto v. Glock Inc.*, 349 F.3d 1191, 1212 (9th Cir. 2003) ("physical and mental injuries are different in kind from the, danger, fear, inconvenience, and interference . . . that affect the tenor and quality of everyday life that plaintiffs allege are suffered by the general public." (internal quotations omitted)); *Birke v. Oakwood Worldwide*, 169 Cal. App. 4th 1540, 1549 (2009) (reversing trial court and holding that "aggravation of [plaintiff's] asthma" constitutes a harm different in kind from the increased risk of developing heart disease and lung cancer—even though they both resulted from secondhand tobacco smoke); *Mangini v. Aerojet-General Corp.*, 230 Cal. App. 3d 1125, 1138 (1991) (holding plaintiffs entitled to bring public nuisance action because "testing costs are sufficient to constitute 'special injury'"). *See also Birke*, 169 Cal. App. 4th at 1550 ("As the Supreme Court explained more than 110 years ago in *Lind v. City of San Luis Obispo*," 109 Cal. 340, 344 (1895), injury "to the health and comfort of an individual, is in its nature special and peculiar.").

*Kane v. Chobani, Inc.*, 2013 U.S. Dist. LEXIS 99359 (N.D. Cal. July 15, 2013), on which Diamond relies, is distinguishable because that case did not involve allegations of interference "with the public's interests in having only safe foods available for purchase," (Compl. ¶91), which is the public nuisance at issue here, and which is distinct from Plaintiff's alleged harms.

### B. Diamond's Use of PHVO Is Not Expressly Authorized

Diamond's argument that Cal. Civ. Code § 3482 bars McGee's nuisance (Mot. at 11), fails because that section shields from nuisance liability only conduct "which is done or maintained under the express authority of a statute," and no statute "express[ly] authori[zes]" use of the partially hydrogenated soybean oil found in the Trans Fat Popcorns. Diamond points to two regulations that supposedly authorize its use of partially hydrogenated soybean oil. These regulations, however, list two types of oils, neither of which was used by Diamond, that underwent the FDA petition process to become Generally Recognized as Safe ("GRAS"). Diamond points to no regulation which lists Partially Hydrogenated Soybean Oil—the type used in the Trans Fat Popcorns—as GRAS. Both cited approvals are expressly limited in their scope, and never purport to include trans fat generally. Diamond's reading would render the FDA's second regulation redundant, since, if a single approval of a single type of partially hydrogenated oil meant that all PHVOs were GRAS, then the second approval would have had no legal effect. Diamond has thus failed to show that its conduct expressly authorized by statute.

Courts "have consistently applied a narrow construction to section 3482," *Greater Westchester Homeowners Ass'n v. L.A.*, 26 Cal. 3d 86, 100 (1979), requiring proof of "unequivocal legislative intent" that "the Legislature contemplated the doing of the very act which occasions the injury," *Id.* at 101. Even where "an activity authorized by statute cannot be a nuisance, the *manner* in which the activity is performed may constitute a nuisance." *Id.* (emphasis in original) (citation omitted). Thus, FDA labeling regulations do not evidence unequivocal legislative intent that PHVO may be used in the manner that

Diamond does. *See id.* (comprehensive statutes that authorize the "planning, location, construction, and operation of airports . . . do not create a legislative sanction for their maintenance as a nuisance," nor are "aviation and noise [so] necessarily inseparable" that "governmental approval and encouragement of aviation activity necessarily implies legislative approval of aviation noise"); *Varjabedian v. Madera*, 20 Cal. 3d 285, 292 (1977).

## IV. McGee Alleges Breach of Implied Warranty

The implied warranty of merchantability requires that goods "[a]re fit for the ordinary purposes for which such goods are used." Cal. Com. Code § 2314(2)(c); Cal. Civ. Code § 1791.1. McGee alleges "the Trans Fat Popcorns are not safe for human consumption," (Compl. ¶ 97), which is how popcorn is ordinarily used. The Complaint specifically alleges she "suffered physical injury when she repeatedly consumed Defendant's Trans Fat Popcorns, because consuming artificial trans fat in any quantity causes inflammation and damage to vital organs and an increased risk of heart disease, diabetes, cancer, and death," (*Id.* ¶ 67.) The Complaint also documents this "well-established scientific consensus that artificial trans fat is extremely harmful," (*Id.* ¶¶ 14-20), including describing and citing to peer reviewed scientific studies which detail the effect of consuming trans fat on human health, (*id.* ¶¶ 27-57). Thus, the Court need not, as Diamond suggests, "accept unreasonable inferences or unwarranted deductions of fact" (Mot. at 12).

The cases Diamond relies on are readily distinguishable from this case. In direct contrast to *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 28 (D.D.C. 2007), where the plaintiff never claimed "emotional harm, pain or suffering," McGee alleges suffering "emotional harm from knowing that she injured herself and her family" by feeding them Diamond's popcorn. (Compl. ¶ 93.) Similarly, while *Hoyte* never alleged "any immediate ill effects," 489 F. Supp. 2d at 28, McGee alleges consumption of the Trans Fat Popcorns caused her "inflammation and damage to vital organs," (Compl. ¶ 67). Lastly, *Hoyte*

"d[id] not specify what 'economic injury' he ha[d] suffered," 489 F. Supp. 2d at 28, but McGee alleges she "lost money as a result of Defendant's conduct . . . in that she purchased products that, because they were detrimental to her health, were unfairly offered for sale in violation of California law," (Compl. ¶ 71). *Viggiano v. Hansen Natural Corp.*, 944 F. Supp. 2d 877 (C.D. Cal. 2013) is also easily distinguishable. There, the plaintiff "d[id] not allege that Hansen's diet soda lack[ed] 'even the most basic degree of fitness for ordinary use" or "that the drink [was] not suitable for use as a diet soda," by, for example, alleging "that the beverage was not drinkable, [or] that it was contaminated or contained foreign objects," 944 F. Supp. 2d at 896. Here, by contract, McGee has alleged that the Trans Fat popcorns are not fit for their ordinary use—human consumption—because Diamond adds large amounts of artificial trans fat. (Compl. ¶¶ 97 and 19-20 (comparing trans fats to pesticides).)

Nor has Plaintiff waived her rights under the implied warranty. (Mot. at 12-13.) "When a buyer before entering a contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." Cal. U. Com. Code § 2316. Comment 8 to section 2316, however, provides that "[t]he particular buyer's skill and the normal method of examining goods in the circumstances determine what defects are excluded by the examination," and "a nonprofessional buyer will be held to have assumed the risk *only for such defects as a layman might be expected to observe*," Cal. U. Com. Code § 2316, Comment 8 (emphasis added). "Nor can latent defects be excluded by a simple examination." *Id.*

"[W]hether there is a latent defect and whether it amounts to a breach of implied warranty are questions of fact for the jury." *Skeen v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 9256, at *48 (D.N.J. 2014) (citation omitted); *see also United States v. Lembke Constr. Co.*, 786 F.2d 1386, 1387 (9th Cir. 1986) ("the determination of whether something constitutes a latent defect is a factual determination"); *Kraft Reinsurance Ir.,*

*Ltd. v. Pallets Acquisitions, LLC*, 845 F. Supp. 2d 1342, 1356-57 (N.D. Ga. 2011) (alleged defects in pallets a question of fact for the jury); *Brittalia Ventures v. Stuke Nursery Co., Inc.*, 153 Cal. App. 4th 17, 24 (2007).

Here, Plaintiff is "a lay consumer who does not have the specialized knowledge . . . which otherwise would have enabled her to associate partially hydrogenated oil with artificial trans fat, and artificial trans fat with disease." (Compl. ¶ 69.) While the nutrition facts panel of the Trans Fat Popcorns indicated they contained trans fat, Plaintiff did not waive the implied warranty because that fact alone would not enable her, or any lay consumer, to understand that the trans fat was artificial, rather than naturally occurring,[7] or to understand how consumption of the *artificial* trans fat would affect her health, (Compl. ¶ 69). Bolstering Plaintiff's allegations, studies have shown that "only 31% [of respondents] knew that hydrogenated oil was related to disease," (John Kozup *et al.*, *The Provision of Trans Fat Information and Its Interaction with Consumer Knowledge*, 40 J. Consumer Affairs 1, 163-76, at p. 165 (2006) (citation omitted), attached as Exhibit 1 to the Weston Declaration. Thus, Plaintiff sufficiently alleged that as a lay person, she could not have detected the latent defect, and has not waived the implied warranty.

These allegations also distinguish this case from *Simpson*, where the complaint at issue did not specify the purchaser's level of sophistication or the average consumer's inability to associate partially hydrogenated oil with artificial trans fat, and artificial trans

---

[7] This is a key distinction as the small amount of natural trans fat found in beef and dairy is chemically different than artificial trans fat and completely harmless. *See*, *e.g.*, Dariush Mozaffarian *et al.*, *Trans Fatty Acids and Cardiovascular Disease*, 354 N. Engl. J. Med. 1608-9 (2006) (cited in Compl. at 7 n.12; *see also* Chardigny et al., *Do Trans Fatty acids from industrially produced sources and from natural sources have the same effect on cardiovascular disease risk factors in healthy subjects?*, at 561, attached as Exhibit 2 to the Weston Declaration; Motard-Belanger et al.*, Study of Effect of trans fatty acids from ruminants on blood lipids and other risk factors or cardiovascular disease*, at 598, attached as Exhibit 3 to the Weston Declaration.). Nor would an assumption that the trans fat listed in the nutrition facts panel were from dairy content be unfounded given names such as "Butter," "Extra Butter," and "Cheddar."

fat with disease, *see Simpson v. California Pizza Kitchen, Inc.*, Case No. 13-cv-164 JLS (JMA), First Am. Compl., Doc. 13. The *Simpson* plaintiff was granted leave to amend to correct this deficiency, not present in the case before the Court. *See* 989 F. Supp. 2d at 1027.

## V. PRIMARY JURISDICTION DISMISSAL IS INAPPROPRIATE

While Diamond does not use the phrase "primary jurisdiction doctrine," it nonetheless suggests that the doctrine should apply when it complains that Plaintiff allegedly seeks a judicial ban of conduct regulated by the FDA and California Legislature. (*See*, *e.g.*, Mot. at 5.) As an initial matter, Plaintiff does not seek to judicially ban trans fat, but rather argues that where a practical alternative exists and is readily available, it is an unfair business practice to use large amounts of artificial trans fat in a product.[8] But more importantly, the primary jurisdiction doctrine does not apply here.[9]

The primary jurisdiction doctrine only "applies in a limited set of circumstances," and "is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit." *Clark v. Time Warner Cable,* 523 F.3d 1110, 1114 (9th Cir. 2008) (citations and quotations omitted). Rather, it is to be used only where there is (1) a need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration. *See Davel Commc'ns. v. Qwest*

---

[8] Diamond is also wrong that the FDA regulates "the use of trans fat," (Mot. at 5). What the FDA has thus far regulated is the *labeling* of products that are made with artificial trans fat. *See* 21 C.F.R. § 101.9. The FDA has also "tentatively" decided to ban on the use of trans fat, *see* 78 Fed. Reg. 67169-67175, but has thus far not regulated its use.

[9] Nor is Diamond's mention that the FDA and California Legislature regulate "the use of trans fats," (Mot. at 5), sufficient to raise the primary jurisdiction doctrine. *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1363 (9th Cir. 1987) ("the competence of an agency to pass on an issue is a necessary condition . . . [but] competence alone is not sufficient"). However, in an abundance of caution, Plaintiff addresses this point for the sake of completeness.

*Corp.*, 460 F.3d 1075, 1086-87 (9th Cir. 2006). Where "allegations of the complaint do not necessarily require the doctrine's applicability, then the primary jurisdiction doctrine may not be applied on a motion to dismiss . . ." *Id.* at 1088. In addition, "where the facts are undisputed, it will rarely be appropriate to dismiss on the basis of primary jurisdiction." *TCG New York Inc. v. City of White Plains*, 305 F.3d 67, 74 (2d Cir. 2002) (declining to refer to FCC dispute under Telecommunications Act of 1996).

### A. No Complex Scientific Issue or Question of First Impression Exists

Primary jurisdiction is inappropriate "because Defendant has failed to demonstrate that [McGee's] claims under California law require the FDA's scientific or technical expertise." *See Delacruz v. Cytosport, Inc.*, 2012 U.S. Dist. LEXIS 51094, at *33 (N.D. Cal. Apr. 11, 2012). Ms. McGee's claims do not involve a complex scientific issue; rather they require a routine balancing of the benefits against the harms of Diamond's use of a toxic carcinogen, which is well within the Court's expertise. *See In re Toyota Motor Corp.*, 754 F. Supp. 2d 1145, 1199-1200 (C.D. Cal. 2010) (primary jurisdiction inappropriate because plaintiffs' auto design defect claims were "within the conventional competence of the courts."); *Brazil v. Dole Food Co.*, 935 F. Supp. 2d 947, 960 (N.D. Cal. 2013) (primary jurisdiction inappropriate because plaintiff's food product claims are more about defendant's conduct and the "reasonable-consumer determination" and "far less about science"). Moreover, because Ms. McGee's claims turn on California law—not federal regulations—no FDA or USDA decision can dispose of Ms. McGee's claims. *See Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d 1028, 1035 (N.D. Cal. 2009) (because "plaintiffs' claims are based on state law," an FDA decision "would not dispose of plaintiffs' state law claims," and primary jurisdiction is inappropriate); *McConnell v. Pacificorp, Inc.*, 2007 U.S. Dist. LEXIS 63948, at *21-22 (N.D. Cal. Aug. 16, 2007) (same). For these reasons, courts have repeatedly rejected primary jurisdiction arguments

in cases concerning packaged foods and nutrition supplements regulated by the FDA.[10,] This Court should do the same.

## B. Dismissal Would Unfairly Prejudice Ms. McGee by Tolling the Statute of Limitations

Even if primary jurisdiction were applicable, the remedy of dismissal without prejudice will unfairly disadvantage Ms. McGee and the members of the class she seeks to represent. *See Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993) (upon a finding of primary jurisdiction, courts have "discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice."). Here, McGee and the proposed class would be unfairly disadvantaged by dismissal because the statute of limitations would run during the pendency of the primary jurisdiction referral, potentially causing one or more of her claims to expire, and certainly causing the claims of class members to expire whose purchases are currently just barely within the statute. *See Brown v. MCI Worldcom Network Servs., Inc.*, 277 F.3d 1166, 1173 (9th Cir. 2002) (reversing the district court's primary jurisdiction dismissal on a number of grounds and further finding, even if primary jurisdiction were applicable, dismissal without prejudice would create an "unfair[] disadvantage[]" because of the claim's statute of limitations); *Davel Commc'ns.*, 460 F.3d at 1091 ("The factor most often considered in determining whether a party will be disadvantaged by dismissal without prejudice is whether there is a risk that the statute of limitations may run on the claims pending agency resolution of threshold issues.").

---

[10] *See Brazil*, 2013 U.S. Dist. LEXIS 42026, at *12; *Delacruz*, 2012 U.S. Dist. LEXIS 90847, at *28; *Lockwood*, 597 F. Supp. 2d at 1035; *Jones v. ConAgra Foods, Inc.*, 2012 U.S. Dist. LEXIS 178352, at *18-19 (N.D. Cal. Dec. 17, 2012); *Chavez v. Blue Sky Natural Bev. Co.*, 268 F.R.D. 365, 375 (N.D. Cal. 2010); *Wright v. General Mills, Inc.*, 2009 U.S. Dist. LEXIS 90576, at *4-10 (S.D. Cal. Sept. 30, 2009); *Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 549 F. Supp. 2d 708, 720 (D. Md. 2008).

24

## **CONCLUSION**

For the aforementioned reasons, the Court should, respectfully, deny the Motion to Dismiss in its entirety, or in the alternative grant Plaintiff leave to amend.

DATED: December 8, 2014                 Respectfully Submitted,

/s/ Gregory S. Weston
**THE WESTON FIRM**
GREGORY S. WESTON
MELANIE PERSINGER
PAUL K. JOSEPH
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone: (619) 798-2006
Facsimile: (480) 247-4553